[PHILADELPHIA, FEBRUARY 16TH, 1839.]

## DAWSON *against* M'GILL.

1. An instrument under seal by which F. in consideration of $600, " grants, bargains sells, assigns, and sets over" to M. all the estate, real and personal which he inherited from his father, " to hold to him the said M. his heirs, executors, administrators and assigns forever," excepting certain parts, &c., and concluding, " M. now pays F. the sum of $55 on account and in part of the above consideration, and engages to pay the remainder upon the execution of a more formal assignment; and F. engages to execute a more formal assignment at the office of J. K. K., Esq., to-morrow morning at 9 o'clock"; which instrument was acknowledged by M. alone before a justice of the peace and recorded; was *held* to be a mere agreement, and not a sufficient conveyance to pass the title.

2. In an action of ejectment in Pennsylvania, the mesne profits may be recovered; and the plaintiff is entitled to recover the profits down to the time of the verdict.

An action of ejectment was brought in this Court by Shadrach Dawson against Michael M'Gill, to recover an undivided fifth part of a certain lot of ground situate in the Northern Liberties of the city of Philadelphia.

The case was tried before ROGERS, J., at a Court of Nisi Prius held at Philadelphia in February, 1838.

Both parties claimed under one Joseph Fricker, who died intestate, leaving five children, viz. John, Nicholas, Catharine, Elizabeth and George. A judgment having been obtained against George Fricker, his undivided fifth part of the premises was taken in execution and sold by the sheriff to Shadrach Dawson, the plaintiff, who received a deed from the sheriff, on the 23d of May, 1835. This was the plaintiff's title.

The defendant alleged—1st. That Joseph Fricker in his lifetime viz. on the 7th of March, 1831, in consideration of the transfer of certain real estate immediately adjoining, and of the sum of $3200, secured by a mortgage on the premises, conveyed the lot of ground in dispute to his son John Fricker. 2d. That George Fricker sold and conveyed to Michael M'Gill, the defendant, all his interest in the premises on the 18th of July, 1834, before the rendition of the

(Dawson *v.* M'Gill.)

judgment under which the property was sold by the sheriff to Dawson, the plaintiff in this ejectment.

Upon the first point evidence was given on both sides. In support of the second ground of defence, the following instrument of writing was produced and proved.

"Memorandum.

George Fricker, in consideration of six hundred dollars, grants, bargains, sells, assigns and sets over to Michael M'Gill, all the estate real, personal and mixed, which he the said George inherited from his father Joseph Fricker, or became in any manner entitled to upon his decease, whether the same is now divided, or undivided, and all the right, title and interest of said George, in or to the same, or any part thereof: To hold to him, said Michael, his heirs, executors, administrators and assigns forever: saving and excepting, however, from this sale and assignment, those portions of the estate of the late Joseph Flicker, which have been sold under order of the Orphans' Court, and George Fricker's claim to a share of the proceeds thereof,—and excepting also such sums of money as said George has received on account of proceeds of his late father's furniture—and of the rents collected by John Fricker in his late father's lifetime.

Michael M'Gill now pays George Fricker the sum of fifty-five dollars, on account and in part of the above consideration, and engages to pay the remainder upon the execution of a more formal assignment; and George Fricker engages to execute a more formal assignment at the office of John K. Kane, Esquire, to-morrow morning at nine o'clock.

Philadelphia, 18 July, 1834.

| Sealed and delivered and money paid in the presence of | GEORGE FRICKER, ( L. S. ) |
| | MICHAEL M'GILL, ( L. S. ) |
| J. K. KANE." | |

This instrument was acknowledged by Michael M'Gill alone, before a justice of the peace, on the 22d of July, 1834, and recorded on the same day. A formal conveyance of the same property, dated the 19th day of July, 1834, but not executed, was also produced.

The substance of the evidence given on the trial, is set forth in the charge of the learned judge, which, after stating the points of defence, was as follows.

" 1st point. Is the deed of the 7th March, 1831, a valid deed, or is it void ?

(Dawson v. M'Gill.)

The execution and delivery of the deed has been proved, in the usual way, by an acknowledgement, before a magistrate; and the proof of its execution by one of the subscribing witnesses. But notwithstanding this, the plaintiff insists, that the deed is void.

1st. Because, at the time of its execution, the mind of the grantor, Joseph Fricker, was so prostrated by age and disease, that he was incapable of making a contract, and particularly one of this complexity and magnitude.

2nd. That the deed is the result of imposition and fraud, practised on a man whose mind was at least enfeebled, by age and disease.

These are questions of fact, and are exclusively for the decision of the jury.

As to the first point.—A person being of a weak understanding, is not, of itself, any objection in law to his disposing of his estates, if he be legally *compos mentis*: whether wise or unwise, he is the disposer of his own property, and his will stands as a reason for his actions. Neither Courts of equity nor law examine into the wisdom or prudence of men, in disposing of their estates. If a weak man gives a bond, or enters into any other agreement, if it be unattended with fraud, or breach of trust, the Courts will not set it aside, only for the weakness of the obligee, or the other contracting party, if he be *compos mentis*. Equity will not measure people's understandings or capacities. On the first point, therefore, you will inquire, not whether Joseph Fricker was a man whose understanding was weakened by age, or other causes, but whether, at the time of the execution of the deed, viz. 7th March, 1831, he was legally *compos mentis*; or in other words, had he sufficient understanding to make the contract of that date. It is of no consequence what name you attach to his condition at that time; whether you call it dementia, senility, fatuity, simple mania, or chaotic mania. For in this part of the case, let me remark to you, that it is of little consequence what may have been the intention of Joseph Fricker, as to the disposition of the property, whether he intended to exchange with John or not. For if, on the 7th March, 1831, he was incapable, from infirmity of mind, of understanding or comprehending the nature of the instrument he was required to sign, the deed is absolutely void, and the defendant's defence, on this ground, must fail. On the point of the state of Joseph Fricker's intellect, on the 7th March, 1831, much testimony has been adduced on both sides. It is not my intention to give it to you in detail. You have heard the comments of counsel on the evidence, and you are very competent to form an opinion upon it. It is conceded, that up to September, 1830, his mind was sound. On the other hand, it is admitted, that after, and about the 1st April, 1831, when he had, as is-alleged, a shock of palsy, his mind was unsound. Your attention will therefore be particularly directed to the testimony which bears upon the intermediate period; and especially you will inquire into the state of

(Dawson v. M'Gill.)

his mind, on the 7th March, 1831, and that portion of it which immediately precedes or succeeds the execution of the deed. You will inquire whether he had mind enough left, on that day, to make the contract. For if he were capable the day before, and the day after, and was not of a sound mind and understanding on that day when the deed was signed, the deed is absolutely null and void. In forming an opinion on this part of the case, you will not disregard the opinion of a witness who, from his profession, his opportunities of judgment, and entire disinterestedness, was best fitted on that day, to form an accurate judgment on the state of his intellect. You will particularly inquire as regards the correctness of dates; to what transaction he alludes in his testimony; to the execution of the deed of the 7th March, 1831, and to the making of the will, sometime in the month of April. On this, I refer you to the testimony of Dr. Kingle, and to the comments of counsel on both sides. In connection, also, with the testimony above referred to, it will be your duty to compare and weigh the whole testimony, making the proper allowances for inaccuracies in respect to dates, of all the witnesses, and the degree of bias which witnesses must have, when their feelings or interests are involved. The facts—and when I say facts, I mean, in contradistinction to opinions—also, to which I shall merely advert, without attempting to detail, (for they are fresh in your recollection,) will not be passed by in your examination. It will be for you to determine, whether they indicate weakness of mind, as well as disease and feebleness of body. In this part of the case, let me remind you, that the burthen of proof is thrown upon the plaintiff. It is for him to satisfy you, that such was the state of his mind, when the deed was executed, that he was incapacitated from entering into the contract. But if the plaintiff has shown a general imbecility of mind, it will be the duty of the defendant to show, that he had so far recovered his understanding, on the day the deed was executed, that he fully comprehended the nature and bearing of the contract of that date. It is not sufficient, that he is able to answer plain and familiar questions. He must have what the law calls a sound mind and disposing memory. His intellect must be sufficiently vigorous to enable him to comprehend and understand the nature of the contract then entered into. If you should be of the opinion, that Joseph Fricker was sane, your next inquiry will be, whether he has been the subject of imposition and fraud. Although neither Courts of equity nor law will, as was before observed, examine into the wisdom or prudence of men, in disposing of their estates, yet there are frequent instances in equity, where not only idiots and lunatics, but also persons of weak understanding, have been relieved, when they appear to have been imposed upon in their dealings. Unreasonable purchases, and securities which have been obtained from them, have been set aside, when want of consideration, or the improvident nature of the transaction, have raised a presumption of

(Dawson v. M'Gill.)

fraud. Every man in the country may give, if he chooses, a part, or the whole of his fortune to the most worthless object in creation. His will is the law. A Court of Chancery will never rescind or annul a gift or contract, merely because it is improvident, and such as a wise man would not have made, or a man of very nice honour would not have accepted; nor will, as I before observed, a Court measure the degree of understanding, and say that a weak man may not give or contract, as well as a wise man. Yet, when the person who gives or contracts is a weak man, liable to be imposed upon, the Court will look upon such a contract with a very jealous eye, and very strictly examine the conduct and behaviour of the persons in whose favour it is made. If the Court see the least spark of imposition at the bottom; or that the donor or grantor is in such a situation, as respects the other, as may naturally give him an undue influence over him, and there be the least semblance of fraud; in such a case, equity will interpose its protection. Such transactions are not favoured, but are rigorously scrutinised and examined in Courts which pretend to administer justice between man and man. With these principles to direct you, you will inquire, whether, on the 7th March, 1831, Joseph Fricker was a man of weak intellect, the consequence of age and disease? Was he in such a situation, in respect to his son John, as to give him an undue influence over him? Were any undue or unfair means used, to obtain the contract? Was it an improvident bargain? In short, was there fraud and imposition on the grantor? If there was, the deed is void. Here let me observe to you, that fraud is not to be presumed. But although it is not lightly to be inferred, yet it may be shown by a combination of circumstances short of positive proof. Age, disease, consequent weakness of intellect, undue influence and circumvention, a studied concealment of the contract from other members of the family, and an improvident contract, are ingredients of, and indicate fraud. If such circumstances exist here, of which you are the exclusive judges, the jury would be justified in forming an opinion adverse to the fairness and honesty of the transaction. In this part of the case, you should not pass by the intention of Joseph Fricker as to a contemplated exchange of property; nor to his ratification of it, after the exchange had taken place. In your examination of the two parts above referred to, you cannot be too careful in observing dates. There is nothing in which we are more apt to be mistaken, unless the memory be assisted by notes or memorandums, or some other causes, made at the time. If the jury should be of the opinion that the mind of Joseph Fricker was sufficiently vigorous on the 7th of March, 1831, to enable him to understand the nature of the instrument of that date, and that there was no undue influence or fraud, the verdict will be in favour of the defendant.

2d point.—But if the jury should be of a different opinion—if they should think that the mind of Joseph Fricker was in such a

(Dawson v. M'Gill.)

state as unfitted him to make the contract, or that there was fraud in obtaining it, it will be their duty to examine the validity of the agreement of the 18th of July, 1824, between George Fricker and Michael M'Gill. If that be a valid and subsisting instrument, it is a fatal bar to the plaintiff's action. The jury will recollect, that on that day, the defendant, Michael M'Gill, purchased all the interest of George Fricker in this estate, for a consideration, as is expressed in the deed, of six hundred dollars. Of this sum, $55 was paid in hand. The residue was to be paid on the execution of a more formal deed, or transfer of the premises. Although the instrument of writing contains the strong expressions, 'grant, bargain, sell and assign,' yet when we view it as a whole, I do not look upon it as a conveyance, but an agreement to convey. It is an executory contract, which the parties intended to consummate, by the execution, on the following day, of a formal instrument or deed. But, whether the contract was executory or executed, still, unless it has been abandoned or rescinded, or in other respects invalid, it is a good defence for the defendant. From the very nature of a contract of sale, whether of real or personal estate, it is very plain, that when once entered into, it cannot be rescinded by either of the contracting parties, without the consent of the other. But, on the other hand, it is equally clear, that if both parties consent, it may be rescinded. So also, when something remains to be done, and either party makes default, it is in the power of the other party to rescind the contract, if the parties can be placed in *statu quo*, that is, in the same situation as before the contract. There can be no doubt that the contract was entered into. The question will be, has the contract been rescinded. This will depend on the testimony of George Fricker, Mr. Kane and the scrivener. George Fricker testifies, in substance, that he had repeated conversations with Mr. M'Gill about a sale of his share, and that it was agreed between him and M'Gill, that M'Gill would give him $600 in cash, and that he would allow for it, on a fair calculation, its full value. That the latter arrangement was to be secret, for a reason which he states. That after having agreed on the terms, they went to Mr. Kane's office, who drew up the agreement, which he read, and was satisfied with. That M'Gill paid him fifty-five dollars in hand. That they were to meet the next day at ten o'clock. That he attended at the time, and that neither Mr. Kane nor Mr. M'Gill was there. That Mr. Kane was sick. That he afterwards told M'Gill he was there. That five or six weeks afterwards he met M'Gill, who asked him to go to Mr. Hœckley's office with him, to which he consented. That he asked M'Gill whether he intended to pay him the money. He said no, that there was some difficulty about it. That his wife's dower was the difficulty, and that at all events he must retain two hundred dollars of the money. The witness then asked M'Gill if he would pay him the four hundred dollars, and let the rest stand,

as he wished it. To which he answered, he would not. That he never intended to pay another cent. That he had no right to pay him. And on being asked to whom he had a right to pay it, he said he did not know to whom. The witness states, that he offered to return the fifty-five dollars, but did not actually tender it to M'Gill. If you believe the testimony, then there was such default as would justify George Fricker in rescinding the contract. And if he did so, and the fact that no further steps have been taken in the affair, is some proof of it, then the agreement is no bar to the plaintiff's claim. In reply to this, the defendant relies on the testimony of Mr. Kane and Mr. Hœckley, whose recollections in some particulars do not tally with George Fricker's. They also say, that the real difficulty which prevented the payment of the money, was a subsisting judgment against George, which bound his interest in the property. In support of this, the defendant has shown three judgments; one in December 1833, for one hundred and sixty dollars; one, the 3d January, 1834, for thirty-three dollars; and the other the 27th June, 1834, for twenty-six dollars thirty cents, amounting to two hundred and nineteen dollars thirty cents. The judgments are all prior to the agreement of the 18th of July, 1834; and if this was the reason of the refusal to pay the residue of the money due on the contract, it was a valid reason, and entirely consistent with an adherence to the contract. But if both parties considered the contract at an end, as they had a right to do, M'Gill, because of the subsisting judgments which bound the property, and of the dower in the wife, and George Fricker, because the money was not paid—and this, perhaps, would be the correct view to be taken of this transaction—the contract was rescinded, and this forms no bar to the plaintiff's claim. But there is still another objection. A point has been made, although not argued by the counsel, no doubt in deference to an opinion expressed at an early stage in this cause, that, independently of the deed of the 7th of March, 1831, the defendant has title to the property. I cannot so charge you, for the law is directly otherwise. Independently of the deed, there was nothing more than a parol agreement between Joseph and John Fricker. By the statute of frauds, a sale of land must be in writing. The valuation was not such a writing as brings the case within the statute. It was not signed by the parties, nor has it been recognised by writing, nor has there been such a possession taken, in pursuance of the agreement, so as to take the case out of the statute. There was no change of possession, or any thing which looks like a change, until after the deed of the 17th March, 1831. You will perceive, therefore, that the cause turns on these points: Was Joseph Fricker insane, or in other words, incapable of contracting on the 7th of March, 1831? Was there any undue influence, circumvention or fraud, in obtaining the contract? Was the agreement of the 18th

(Dawson *v.* M‘Gill.)

of July, 1834, rescinded, abandoned, or otherwise inoperative? Your attention will be particularly directed to the two first points. If you should be of the opinion that Joseph Fricker had sufficient mind to understand the nature of this contract, that no undue fraud or circumvention was exercised over him, then your verdict should be in favour of the defendant. Or if you should believe that the contract of the 18th of July affects these parties, your verdict will be in the same way. But if you should be in favour of the plaintiff on both points, you will have a further duty to perform; that is, to assess the damages for the mesne profits. The measure of damages in general, will be, the one-fifth of the annual value on the whole property, from the 6th of June, 1835, until the first day of the next meeting of the Supreme Court, which will be the 19th day of March next. If you should believe that any peculiar circumstances exist in this case, of which you are the judges, then you are not confined to the value of the property as the measure of damages."

The jury found for the plaintiff, with $600 damages; and the defendant moved for a new trial, and filed the following reasons.

" 1. The judge erred in charging the jury, that a certain deed between one George Fricker and the defendant, made the 18th day of July, 1834, did not vest title to the premises in the defendant.

2. The judge erred in charging the jury, that they might lawfully find for the plaintiff damages for mesne profits in this suit, the defendant not having had notice until the cause was on trial, that such damages would be claimed therein.

3. The judge erred in charging the jury, that they might lawfully find for the plaintiff more damages for his mesne profits than the actual value of such mesne profits; and in not charging them, that an innocent purchaser is entitled to set off improvements made by him in abatement of mesne profits.

4. The jury have erred in finding damages for the plaintiff as for his mesne profits; and the damages found are excessive.

5. The verdict is otherwise against law and evidence."

Mr. *Kane* and Mr. *David Paul Brown*, for the motion.
1. The deed of the 18th of July, 1834, vested a complete and absolute title in the defendant. It is true that there are two covenants in it, one for further assurance, and the other for payment of a balance of the purchase-money; but these will not make the whole agreement executory. The covenant for further assurance is often found in deeds which are in no respect executory. The default of either party will not suffice to rescind the contract. The instrument was recorded, and could not be rescinded. The defendant had

(Dawson *v.* M'Gill.)

nothing further to do. The evidence proved that he complied with his agreement. [Rogers, J. referred to the case of *Stouffer* v. *Coleman*, (1 *Yeates*, 393.)] That case differed from this, because there was a penalty, which showed the intention of the parties, that the contract was to be executory.

2d. A recovery of the mesne profits in ejectment is very unusual; and the cases show, that here, as well as elsewhere, the right has often been questioned. *Harvey* v. *Snow*, (1 *Yeates*, 159.) *Boyd* v. *Cowan*, (4 *Dall.* 138.) *Murray* v. *Garretson*, (4 *Serg. & Rawle*, 131.) *Osborne* v. *Osborne*, (11 *Serg. & Rawle*, 58.) *Van Alen* v. *Rogers*, (1 *John. Cas.* 283.) *Adams on Ejectment*, 328. 4 *Bac. Abr.* 437, tit. *Ejectment.* At all events, notice ought to be given in form, and a sufficient length of time before the trial, of the plaintiff's intention to claim the mesne profits, that the defendant may have an opportunity to produce evidence upon the point. *Battin* v. *Bigelow*, (1 *Peters's C. C. Rep.* 452.) Here no notice was given before the trial; and the first intimation received by the defendant's counsel of the intention of the plaintiff to go for the mesne profits was by a conversation at the bar.

3d. The defendant ought to have been allowed to set off improvements against the claim for mesne profits. *Maris* v. *Semple*, (*Addison*, 215.) *Hilton* v. *Brown*, (2 *Wash. C. C. Rep.* 165.) *Jackson* v. *Thomas*, (4 *Cowan*, 168.)

Mr. *C. Ingersoll* and Mr. *Randall, contra.*

1. The defendant was not in possession under the alleged deed. The instrument was not duly recorded, because it was acknowledged only by the grantee. We alleged fraud in the defendant, and the jury have sanctioned the charge by their finding. The incapacity of Joseph Fricker is now admitted. The judge was not asked to charge that this was an executed contract. The language shows that it was merely executory. The judge left the facts fairly to the jury.

2. It is clear, from the authorities, that the mesne profits may be recovered in ejectment. *Adams on Ejectment*, 328, 338. *Brown* v. *Galloway*, (1 *Peters's C. C. Rep.* 299.) *Goodtitle* v. *Tombs*, (3 *Wilson*, 121.) *Buller's N. P.* 87, 8. 2 *Barnes*, 59. 86. *Starr* v. *Pease*, (8 *Conn. Rep.* 541.) *Denn* v. *Chubb*, (1 *Coxe*, 466.) *Morgan* v. *Varick*, (8 *Wendell*, 591.) *Gulliver* v. *Drinkwater*, (2 *Term Rep.* 251.)

3. The question of improvements was not made at the trial. The rule is, that to entitle a defendant in ejectment to compensation for improvements, they must have been made in good faith, and with entire ignorance of the plaintiff's title; which was not the case here. *Jackson* v. *Loomis*, (4 *Cowen*, 168.) *Green* v. *Biddle*, (8 *Wheaton*, 1.)

The opinion of the Court was delivered by

(Dawson v. M'Gill.)

GIBSON, C. J.—The paper executed by George Fricker evidently did not pass the title. Though containing potent words of present transfer, as well as a formal clause of *habendum*, it was obviously intended for a memorandum, for it has the immethodicalness of one. By the name of a more formal assignment, he reserved the execution of the conveyance till the money should be paid; for what would have been the value of the arrangement to him, if the title had passed in the mean time? The writing in *Coleman* v. *Stouffer*, (1 *Yeates*, 393,) which, with the exception of the *habendum*, had all the features of the present, was treated as an agreement. Then as to the damages.

It is, perhaps, the better opinion, that by the English practice, mesne profits *eo nomine*, were never recovered in ejectment, because the trespass was not laid with a *continuando*; yet, as not only the expulsion, but the detainer also, was usually laid as a part of the *gravamen*, it is probable that substantial damages were given for it, else the plaintiff, previously to the time when the term began to be recovered, must have been remediless, since he could not acquire a constructive possession to found an action of trespass. In Pennsylvania, however, the practice of assessing damages for the mesne profits directly, began at an early date—probably before the secession of Delaware, where it prevails to this day. That it prevailed with us pretty generally at the close of the revolution, is shown in the opinion prepared by Chief Justice M'KEAN, in *Boyd's Lessee* v. *Cowan*; notwithstanding which, it seems to have been discontinued, in consequence, perhaps, of a doubt raised in the professional mind, by the sentiments of his brethren, who, I was told by the late Chief Justice YEATES, were prepared to overrule him. As no judgment was pronounced, the mere formation of their opinion is entitled to nothing like the respect which is due to actual adjudication; and even its numerical preponderance on the particular occasion, is compensated by the antagonist opinion said to have been held by their predecessors. As far, then, as the extra-judicial opinion of the bench has come to us, it is in favour of what I take to be the ancient practice, which, to say the least, is not discountenanced by any thing that fell from Mr. Justice DUNCAN, in *Osbourn* v. *Osbourn*. The introduction of the new practice is entitled to the less weight, because, as there were few ejectments for cultivated land, there was little to turn the attention of the bar to the old one. Had the objections to it been examined, they would have been found to rest on nothing more solid than the form which the action had received from the plastic hand of the Courts, whose power over it, for purposes of convenience, might have been still more efficiently exerted. Whatever force there may have formerly been in the assertion, that only nominal damages can be recovered of a nominal defendant, it is sufficient for the present to say, that our statutory ejectment is an actual proceeding betwixt actual parties. Besides,

(Dawson v. M'Gill.)

substantial damages for mesne profits might as well be given against a nominal defendant, as substantial damages for the ouster, which, it is agreed, arc recoverable by the English practice. But then they are recoverable only as for a trespass laid with a *continuando*, which the tort, in an ejectment, is not. This is the only thing which presents the show of an obstacle. It might, however, have readily been removed by those who first adapted the machinery of the action to purposes of practical usefulness, but who seem not to have been sufficiently alive to the vexation and expense of consecutive actions, whose aim had been as well attained by one: much more readily may it be removed by us who have power by statute to devise new writs and forms of practice. Now we should be over-nice did we make the want of a *continuando* in our writ the ground of a limited practice under it, when, though nominal damages are constantly assessed to carry costs, the statute has struck every thing like tort or trespass out of it. We pay little respect to congruity of form in an action to which, though charging nothing but actual possession of the plaintiff's land, the plea is directed to be not guilty—especially as a notice or a suggestion would sufficiently apprise the defendant of the matter to be answered. It would be idle to be restrained by want of form in an action which has no form; or to be guided in practice by forms which have been abolished. Tolerating, as we do, a recovery of at least nominal damages for a supposititious ouster not even alleged in the writ, our endurance will not be much more severely tasked by sanctioning a recovery of mesne profits without an allegation of a trespass with a *continuando*. The usefulness of such a practice is found in our sister states to outweigh its inconsistency even with common law forms; and its justice is shown by the statute of limitations, which, as it is generally asserted, and as it has been ruled in *Hare* v. *Fury*, (3 *Yeates*, 13,) by the judges of this Court at Nisi Prius, bars a recovery in trespass for all but the last six years. Now I do not say positively that the law is thus settled; but notwithstanding the decision in *Murphy* v. *Guion*, (1 *Carolina Law Repository*, 94,) that the statute begins to run only when possession is taken under a recovery in ejectment, all the text writers follow the dictum in *Buller's Nisi Prius*, that it runs from the several parts of the trespass. It seems to have been conceded in the case quoted, that an entry without process would give a retrospective possession sufficient for the purposes of trespass; but in that aspect the main conclusion arrived at would be inconsequent, for the plea of *actio non* would be maintained by showing that the cause of action had not accrued for the first time within the period immediately preceding the writ. Contrary to the admission in the quoted case, however, it seems to be settled that trespass for mesne profits lies not before entry by judgment—at least it is so asserted by Lord HARDWICKE in *Norton* v. *Fricker*, (1 *Atk.* 252.) If then, a plaintiff who has been long

(Dawson v. M'Gill.)

baffled, may not maintain an action for mesne profits before he has recovered the possession, and if he can then have damages for no more than the last six years, it is evident that there is a defect in the process of the law which calls for amendment. Could he even have trespass on an actual entry pending his ejectment, it would be oppressive to burthen him with successive actions to cover intermediate periods which might else be excluded from recovery by the statute—to say nothing of the repugnance there might be betwixt success on these and subsequent defeat in the struggle for the possession.

In our statutory ejectment, therefore, the plaintiff must be allowed to go for the possession and the profits together; and the remaining inquiry regards the time for which he shall be permitted to recover. In *Starr* v. *Pease*, (8 *Connecticut Rep.* 541,) the Supreme Court of that state, bounded it by the exit of the writ; but as the accretion of subsequent profits might still require a supplemental action, and as a part even of these might be barred pending the ejectment, the rule of that Court might not answer all the purposes of justice. Departing from the English practice in a single particular, it would be idle to stop short of full relief; and we are bound to allow profits to be recovered for the whole time which has preceded the verdict. Nor is there any lack of analogy for it. By the statute of Merton, a widow is entitled to damages for detention of dower, from the death till the judgment; yet damages are always given by an inquest on a judgment of seisin by default, till the taking of the inquisition. Even interest on a penalty or promissory note, is given as damages for the detention of the debt till the time of the verdict; and thus we see, that though no part of the cause of action must appear in the pleadings to have arisen after the inception of the suit, the principle does not prevent the recovery of an accessory which has accrued subsequently: consequently the damages here were well assessed.

Rule discharged.